IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,
                    Plaintiff,

v.                                                    No's 13-10140-01, 02, 03

Manuel Torres Arevalo, et al.,
                    Defendants


MEMORANDUM AND ORDER


    The government has charged all the defendants (Manuel Torres Arevalo, Marisela Ramirez, Jorge Rodriguez-Maciel, Maria Rosario Diaz, and Victor Diaz) with conspiring to distribute 50 grams or more of methamphetamine (in violation of 21 U.S.C. §§ 846, 841). The government also charges that defendant Marisela Ramirez mutilated a Federal Reserve Note (18 U.S.C. § 333), and attempted the depredation of government property (18 U.S.C. § 1361).

    This matter is before the court on two motions to suppress wiretap interceptions, filed on behalf of the defendants Arevalo, Ramirez, and Rodriguez-Maciel. The first motion (Dkt. 47) was filed on behalf of all three defendants on December 9, 2013. The second motion (Dkt. 69), on behalf of Ramirez and Rodriguez-Maciel, was filed on June 2, 2014.

    The defendants' motions address different issues. The first motion challenges the wiretaps on the grounds that the interceptions did not comply with the statutory

requirements for "minimization," that is, the requirement that intercepting officers try to avoid listening to innocent conversations. See 18 U.S.C. § 2518(5) (wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception"). Under 18 U.S.C. § 2518(5), when law enforcement agents listen to a conversation in a foreign language "and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception."

The defendants agree that the validity of the wiretaps is determined by Kansas law. (Dkt. 69, at 2). Kansas law permits judges to authorize wiretaps, but the authority to intercept calls is limited to the judge's territorial jurisdiction. *State v. Adams*, 2 Kan.App.2d 135, 576 P.2d 242 (1978). Under Kansas law, an "interception" occurs when the police listening device actually intercepting is within its jurisdiction. *State v. Gibson*, 255 Kan. 474, 489, 490 (1994). *See United States v. Luong,* 471 F.3d 1107, 1109 (9th Cir. 2006). Thus, the interception happens where the tapped phone is located and where law enforcement officers first overhear the call. *United States v. Rodriguez*, 968 F.2d 130, 136 (2nd Cir. 1992).

The defendants allege that in the present action the calls were not intercepted within the territorial jurisdiction of Johnson County, Kansas, because "[a]fter the first thirty days, the calls were intercepted and monitored in St. Louis." (Dkt. 47, at 1-2). According to the government, however, "all calls … were initially intercepted, heard and recorded in Johnson County, Kansas." (Dkt. 95, at 12).

*Findings of Fact*

The first two wiretap orders, TT1 (for "Target Telephone") and TT2, were issued by a Johnson County District Judge on March 29, 2013. TT1 authorized interception of a prepaid cellular telephone issued to a "Heather Lock" at 1052 Longwood Avenue, but actually used by defendant Arevalo. TT2 authorized interception of a prepaid cellular telephone issued to "David Lopez," but also used by Arevalo. Both orders stated that the

> interceptions … will occur at the offices of the DEA Kansas City Office, located at 7600 College Boulevard in Overland Park, Johnson County, Kansas, regardless of where the telephone calls are placed to or from, so that all interceptions will first be heard in the DEA office in Overland Park, Johnson County, Kansas.

In addition, both TT1 and TT2 required minimization of the intercepted communications, pursuant to Kansas law:

> Conversations will be minimized in accordance with K.S.A. 22-2516(5). These interceptions will also be minimized when it is determined, through voice identification, physical surveillance or otherwise, that neither Subject Interceptees, nor their associates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if one or more associates, when identified, are a participant in the conversation, monitoring will be minimized if the conversation is not criminal in nature or otherwise related to the offenses under investigation. It is understood that the agents will be permitted to spot check minimized conversations to determine whether the conversation has turned criminal in nature, and therefore, subject to interception that an expert or person otherwise fluent in that language will be available to monitor and to translate during the interception whenever possible. In the event the translator/expert is not an investigative or law enforcement officer, the translator, whether a language trained support employee or someone under contract with the Government, will be under the direct supervision of an investigative or law enforcement officer authorized to conduct the interception. If however, such a translator is not reasonably

available during the interception period, minimization may be accomplished as soon as practical after such interception. The following after-the-fact minimization procedures have been established for conversations: (1) All such foreign language conversations will be intercepted and recorded in their entirety; and (2) As soon as practicable after such interception, these conversations will be minimized by a translator under the guidance of an investigative or law enforcement officer authorized to conduct the interception.

Consistent with this order, the agents overseeing the wiretap arranged to have linguists in the Overland Park office to monitor the telephone calls.

On April 2 and 8, 2013, the same judge issued Amended Orders as to TT1 and TT2, based on information showing the use of the telephones. The Amended Orders contained identical language as to the place of interception and the requirement for minimization. The TT1 authorization ended April 27, 2013. The TT2 authorization ended April 26, but was reauthorized the same day.

The Johnson County District Court authorized three additional interceptions during 2013:

| Order | Date | Listed Customer | Actual User |
|-------|------|-----------------|-------------|
| TT5 | May 15 | "Prepaid Customer" | Pariete (aka Maciel) |
| TT6 | May 22 | "Holly Nunez" | Arevalo |
| TT7 | May 29 | "Prepaid Customer" | Maciel |

Each of the additional orders contained similar requirements for interception and minimization.

Under the original minimization procedure, the intercepted calls were first heard "live" in Johnson County by Spanish-speaking monitors supervised by DEA agents or task force officers. If the communication was in Spanish, the linguists listened to or reviewed the communication, and minimized it in accordance with the state court's

4

orders. Any portion of the intercepted communication that was actually heard or reviewed was recorded and this recording was maintained in accordance with the state statutes. If the linguists or agents (when the call was in English) minimized (or did not listen to) a portion of an intercepted communication, that portion of the communication was not recorded.

Because of the federal budget sequestration in the Spring of 2013, the Spanish-speaking monitors were moved from Johnson County to St. Louis, Missouri. The decision was made for budgetary reasons, and was not made by DEA personnel in Johnson County, the Johnson County District Court, or by the District Attorney.

The translators used by the DEA are employees of a separate company, MDM, Inc., based in St. Louis. The sequestration did not prevent their continued employment under the DEA's contract with MDM, but did preclude additional per diem and lodging expenses, thus precluding their continued employment in Kansas. Up to a half-dozen linguists were required to support the translation services.

Translators employed by the DEA take extensive written and verbal tests. They must have security clearances, and must agree to engage in long sessions to support the 24-hour constant monitoring required under the authorized surveillance. At the hearing, the lead DEA Agent testified credibly that there are not many translators who can meet these requirements, given the labor-intensive nature of the work.

The DEA notified the Johnson County District Attorney and the Johnson County District Court of the change. Judge Sara Welch of the Johnson County District Court authorized "after the fact" minimization for intercepted communications. Under these

procedures, all intercepted calls were first heard by on-duty agents at the Overland Park office, and recorded in their entirety. Calls in English were minimized by the agents immediately. Recordings of calls in Spanish were forwarded, as soon as practical after the call was terminated, to a Spanish linguist at the St. Louis Division Regional Intercept Wire room.

In St. Louis, the monitor would play the recording and decide within two minutes if the conversation related to the offenses cited in the wiretap order. If the conversation was related to such criminal activity, the monitor would translate and transcribe the conversation. If the conversation appeared unrelated, the monitor would not listen to the continuing conversation, except for subsequent "spot checks" to see to the conversation had begun to address criminal activity. The monitors logged the conversations and minimizations. The only portions of the intercepted communications which were translated were those the monitors found to be "pertinent." Calls shorter than two minutes were generally not minimized.

These minimization procedures were implemented prior to the TT5, TT6, and TT7 authorizations.

The evidence shows that the state court exercised care in authorizing and regularly supervising the wiretaps. Judge Welch exercised significant supervision of the execution of the wiretaps and the associated minimization.

*Conclusions of Law*

*Minimization*

Under 18 U.S.C. § 2516(2), the court may receive evidence obtained through a state-authorized wiretap order issued by a judge of competent jurisdiction and which otherwise complies with "section 2518 of this chapter and with the applicable State statute."

The defendants' first motion focuses on the alleged lack of minimization. The federal wiretap "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). As the defendants acknowledge, once the adequacy of minimization efforts is challenged, the government must make a prima facie showing that its efforts at minimization were reasonable. If it makes this showing, the burden shifts to the defendants to show more effective minimization could have taken place. *United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989) (citing *United States v. Armocida*, 515 F.2d 29, 45 (3d Cir.), *cert denied*, 423 U.S. 858 (1975).

To comply with § 2518(5), the "government's efforts to minimize interception of non-pertinent conversations must be objectively reasonable in light of the circumstances confronting the interceptor." *United States v. Brown*, 303 F.3d 582, 603 (5th Cir. 2002). (internal quotation marks omitted).

> In determining whether the government has made a prima facie showing of reasonable efforts to minimize the interception of non-pertinent calls, we consider the factors identified by the Supreme Court in *Scott*: (1) whether a large number of the calls are very short, one-time only, or in guarded or coded language; (2) the breadth of the investigation underlying the need for the wiretap; (3) whether the phone is public or private; and (4) whether the non-minimized calls occurred early in the surveillance. 436 U.S.

at 140–41, 98 S.Ct. 1717. It is also appropriate to consider (5) the extent to which the authorizing judge supervised the ongoing wiretap. *United States v. Lopez*, 300 F.3d 46, 57 (1st Cir.2002); *United States v. Daly*, 535 F.2d 434, 442 (8th Cir.1976); *United States v. Vento*, 533 F.2d 838, 853 (3d Cir.1976).

*United States v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008).

Other Circuits have identified similar factors grounded on *Scott*. Thus, in the Fifth Circuit, courts look to "'(1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision.'" *Brown*, 303 F.3d at 604 (quoting *United States v. Bankston*, 182 F.3d 296, 307 (5th Cir.1999)). Generally, very short calls are not subject to minimization. *See Yarbrough*, 527 F.3d at 1098 (excluding calls under two minutes, citing *Scott*, 436 U.S. at 140, (noting "agents can hardly be expected to know that [very short] calls are non pertinent prior to their termination")). In *Yarbrough*, the court found the government's minimization procedures were prima facie reasonable, based on the showing that (1) 25.6% of the calls longer than two minutes were minimized, (2) the minimization was supervised by a judge on a weekly basis, (3) the criminal investigation into gambling and bribery was extensive, (4) that the targeted cellphone was the defendant's personal phone and not a phone used by other persons, and (5) that non-minimized calls happened more frequently early in the investigation, "at a time when agents were learning to identify speakers, the speakers' relationships to *Yarbrough*, and the significance of the conversations." *Id.*

The government need not show "contemporaneous minimization was an utter impossibility" before using after-the-fact translators to conduct minimization procedures. *See United States v. David*, 940 F.2d 722, 730 (1st Cir. 1991). Rather, it need

only show that it engaged in "reasonable, good faith efforts" to obtain translators "willing and qualified to serve as interpreters without compromising the investigation or the government's legitimate security concerns." *Id. See also United States v. Padilla-Pena*, 129 F.3d 457, 463 (8th Cir. 1997) (government was not "required to shut down the wiretap until Spanish monitors could be obtained," only that it used reasonable efforts to obtain such monitors).

Here, the investigation was part of an extensive drug trafficking investigation. "'[M]ore widespread surveillance' is justified when the wiretap is targeted toward what is thought to be a widespread conspiracy." *United States v. Killingsworth*, 117 F.3d 1159, 1165-66 (10th Cir.1997) (quoting *Scott*, 436 U.S. at 139-40). The targeted phones were personal cellphones used by the defendants. The calls were monitored for relevance to the investigation, and as noted earlier, the wiretaps were undertaken under the active and careful supervision of the state court. The procedures adopted to ensure minimization were careful and deliberate. The sequestration-driven relocation of the translators to St. Louis was beyond the control of the investigating agents, and qualified alternative translators, with the necessary security clearances, were not readily available. The evidence provided at the hearing established that the wiretap monitoring was extremely labor-intensive, requiring constant, 24-hour-per day attention, thereby precluding the use of alternative local translators. Further, faced with the budgetary shortfall, the agents actively sought and received judicial approval for the modified minimization procedures.

In sum, the court finds that the minimization of the wiretaps was objectively reasonable and consistent with 18 U.S.C. § 2518(5).  The defendants have failed to show the existence of more effective minimization procedures, given unexpected sequestration and the absence of certified translators with security clearances who could provide the labor-intensive monitoring required.

In *United States v. Johnson*, No. 90-5079, 1991 WL 103375 (4th Cir. 1991), the court affirmed the decision of the district court holding that the government had met its burden of showing its minimization procedures were reasonable *and* that the defendant had failed to show the existence of a more effective procedure. The court stressed that the requirement of minimization "does not leave all innocent communications unheard," and that the focus of the court remains whether the minimization efforts were "reasonable under the circumstances" based upon "review[] on a case by case" basis. *Id*. at *4. In rendering this decision the nature of the underlying criminal enterprise may be decisive.

> When law enforcement officials are confronted with a large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps. The Seventh Circuit, in considering a drug conspiracy, held that
>
> > [l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy.

> *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir.1975). In fact, the
> legitimate investigation of conspiracies may necessitate the interception of
> all or almost all communications over a given period of time.

*Id*. at *5 (quoting *United States v. Clerkley*, 556 F.2d 709, 716-17 (4th Cir.1977)*, cert. denied sub nom. Genco v. United States*, 436 U.S. 930 (1978)).

Similarly, in *United States v. Willis*, 890 F.2d 1099, 1102-03 (10th Cir. 1989), the Tenth Circuit observed that the defendant, in responding to the government's prima facie showing, must point specifically to alternative minimization procedures which are still consistent with effective investigation of conspiracies involving organized crime:

> Law enforcement officers need reasonable latitude to pursue investigatory techniques in order to uncover surreptitious criminal activity. In this information age, with the potential for the planning and the perpetration of criminal activities via telephones and other communications devices so great, procedures exist whereby investigators may go to a United States district judge and upon a showing of probable cause gain temporary permission to monitor the telephone calls of individuals believed involved in criminal activity. *See, e.g.*, 18 U.S.C. § 2518. If the courts were to find the facts at bar represented unreasonable conduct, it might serve to handcuff law enforcement personnel. *See United States v. Cox*, 567 F.2d 930, 933 (10th Cir.1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1496, 55 L.Ed.2d 522 (1978) (an overly restrictive interpretation of the minimization requirement could make it impossible to use this device in connection with the investigation of organized criminal conspiracies). This we decline to do.

"As to the defendant's burden, 'it is not enough to identify particular calls which [he] contend[s] should not have been intercepted; [he] must establish a pattern of interception of innocent conversations which developed over the period of the wiretap.'" *United States v. Dimora*, 835 F.Supp.2d 534, 573 (N.D. Ohio 2011) (quoting *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir.1985) (internal citations and quotations omitted)). Here, the defendants have failed to demonstrate the existence of a pattern of

interceptions of innocent conversations. Moreover, the target of the investigation was an ongoing narcotics trafficking conspiracy. The minimization efforts were reasonable, and the defendants have failed to demonstrate the interception of a substantial number of non-pertinent calls. *See United States v. McDowell*, 2011 WL 830534, *6 (D. Kan. 2011) (defendants failed to meet burden of showing particular method for improving minimization).

Finally, even assuming that the defendants had shown a more effective method of minimization was reasonably available, they have done nothing to show that the remedy sought – complete suppression of the intercepted calls – is appropriate. Where the government fails to properly minimize calls intercepted pursuant to a valid warrant, the "drastic remedy" of wholesale exclusion is upheld in rare cases only. *See Dimora*, 836 F.Supp.2d at 582.

> At most, suppression of only the non-pertinent calls that were improperly minimized would be appropriate. *See United States v. Baltas*, 236 F.3d 27, 32 (1st Cir.2001), cert. denied, 532 U.S. 1030, 121 S.Ct. 1982, 149 L.Ed.2d 773 (2001) ("[E]rrors in minimizing one particular interception within the context of a lengthy and complex investigation ... do not automatically warrant suppression of all the evidence obtained through electronic surveillance."); *see* [*United States v.*] *Gray*, 372 F.Supp.2d [1025,] 1046 [(N.D. Ohio 2005), *aff'd in relevant part*, 521 F.3d 514 (6th Cir. 2008)]. The First Circuit has noted that "in a particularly horrendous case, total suppression may be ... an 'appropriate' solution," but the court also noted that the "sweeping relief" of complete suppression is only appropriate upon a showing of "taint upon the investigation as a whole ...." *United States v.*] *Hoffman*, 832 F.2d [1299,] 1309 [(1st Cir. 1987)] (While the district court suppressed 22 calls it believed to be improperly minimized, defendant was not entitled to total suppression because the "minimization effort, assayed in light of the totality of the circumstances, was managed reasonably."); *see United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir.2002) (If the defendants were to prevail on their minimization argument, "the appropriate relief likely would be to suppress any conversation or

12

conversations that were inappropriately monitored."); *United States v. Charles*, 213 F.3d 10, 22 (1st Cir.2000) (district court properly suppressed only the call that violated the minimization order, and not the entire wiretap, where no evidence that entire investigation was tainted); *United States v. West*, No. 06–20185, 2009 WL 4506420, at *1 (E.D.Mich. Nov. 30, 2009) ("suppression of all wiretap evidence is only appropriate when the failure to minimize is egregious").

Here, the defendants argue in favor of suppression by relying on a single case, *United States v. Renzi*, 722 F.Supp.2d 1100 (D. Ariz. 2010). *Renzi*, however, is manifestly different from the present case. In that action, the court granted the relief of suppression because it was faced with "unreasonable *wholesale* interception of calls [which investigators] *knew* to be *attorney-client communications*." 722 F.Supp.2d at 1118 (emphasis added).

This trifecta of misconduct is not present here. Investigators targeted only cell phones which evidence shows were being used in an ongoing drug-trafficking conspiracy. The attorney-client privilege is nowhere present. And, as noted below, there is no evidence whatsoever of knowing or intentional misconduct or bad faith on the part of the investigators. The budget sequestration was a problem thrust upon them. The officers did not conceal the problem or in any way misrepresent their proposed remedy. Rather, they actively and fully informed the court of the issue, and obtained judicial approval for modified procedures which balanced the need for continued surveillance, real-time translation, and effective minimization.

*Jurisdiction*

The defendants' second motion as to the wiretaps "incorporates by reference the facts as stated" in their first motion (Dkt. 69, at 1), but otherwise does not address or elaborate on the claim that the government's minimization procedures were unreasonable. Rather, the motion advances a jurisdictional argument. That is, the defendants contend, the Johnson County District Court was without jurisdiction to enter the wiretap orders because, according to the defendants, while the calls were initially intercepted in Kansas, after the first month, "the calls were intercepted and monitored in St Louis Missouri." (Dkt. 69, at 2).

The court finds that the evidence does not support this contention. The live listening and recording occurred in Johnson County, Kansas. The only event occurring in St. Louis was the after-the-fact minimization, which was specifically approved by the Johnson County District Court.

The subsequent minimization efforts in St. Louis were reasonable in light of the federal government budget sequestration during the relevant time period, and the corresponding relocation of Spanish-language translators to St. Louis. Other than the relocation of the translators to St.  Louis, the defendants have done nothing to show how the minimization procedures (detailed above) were in any way inadequate.

The defendants' jurisdictional argument fails because the calls were intercepted in Kansas. The jurisdictional argument presented by the defendants is grounded in Kansas law, specifically K.S.A. 22-2516(3). *See State v. Gibson*, 255 Kan. 474, 489 (1994);

*State v. Adams*, 2 Kan.App.2d 135 (1978). Nothing in the law cited by the defendants indicates an intent to restrict the jurisdictional application of the state statute so as to require that *both* the interception *and* the minimization procedures occur within Kansas.

To the contrary, many of the federal cases cited by the defendants directly suggest such a narrow reading is wrong. Thus, the defendants take language from *United States v. Rodriguez*, 968 F.2d 130, 136 (2nd Cir. 1992) and *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006) to suggest that interception occurs only where it is "first heard" by law enforcement officers. But a full reading of both cases clearly indicates that such a narrow reading is not correct.

In *Rodriguez*, the court concluded that Congress intended "interception" under 18 U.S.C. § 2518(3) to be broadly defined, to include *either* the place of physical interception, *or* the place where the conversation was listened to.

> The statute does not specify precisely where an interception is deemed to occur. It seems clear that when the contents of a wire communication are captured or redirected in any way, an interception occurs at that time. Such an interception plainly occurs at or near the situs of the telephone itself, for the contents of the conversation, whether bilateral as is usually the case, or multilateral as is the case with a conference call, are transmitted in one additional direction. Redirection presupposes interception. Accordingly, a federal court sitting in the jurisdiction in which the to-be-tapped telephone is located would have the authority, under § 2518(3), to authorize a wiretap.

> Nonetheless, since the definition of interception includes the "aural" acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard. *See* Webster's New International Dictionary, at 182 (2d ed. unabridged 1957) (defining "aural" as "of or pertaining to the ear or the sense of hearing"). Indeed, prior to 1986, Title III's definition of interception focused on "aural acquisition[s]" alone. The phrase "or other" was inserted into the present definition as part of a modernization of Title

> III to ensure privacy protection for new forms of communication such as electronic pagers, electronic mail, and computer-to-computer communications…. Though it is plain that Congress intended to expand the scope of Title III to extend its protections to modern forms of communication, there is no indication in the legislative history that it intended to extinguish the principle that the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation, is the situs of an interception within the meaning of § 2510(4).

968 F.2d at 136. Thus, *Rodriguez* holds that interception under the federal statute occurs "not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." *Id*. The "not only … but also" language clearly indicates that jurisdictional requirements are satisfied if *either* physical interception *or* aural hearing occurs within the territory of the court authorizing the wiretap order.

*Luong* expressly agrees with *Rodriguez*, and with the Fifth Circuit's decision in *United States v. Denman*, 100 F.3d 399, 402-03 (5th Cir. 1996). In *Denman*, the court interpreted *Rodriguez* to hold that "an interception *includes*, but is not limited to, the situs of the telephone itself" as well as the place where it is "first heard." 100 F.3d at 402-03 (emphasis in *Denman*)

Finally, the Tenth Circuit's decision in *United States v. Tavarez*, 40 F.3d 1136 (10th Cir. 1994) also supports this broader, disjunctive understanding of where a wiretap "interception" occurs. The defendant in that case argued that the Oklahoma state court authorizing the wiretap was without jurisdiction, because his telephone was located in another jurisdiction. The court rejected the contention "that an interception occurs only at the tapped telephone," and explicitly agreed with the broader language from

*Rodriguez*, that "'a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard.'" 40 F.3d at 1138 (quoting *Rodriguez*, 968 F.2d at 136). The court also approvingly quoted the observation in *United States v. Burford*, 755 F.Supp. 607, 611 (S.D.N.Y.1991) that "[j]urisdiction [to authorize a wiretap] vests *either* in the location where the conversations are actually heard *or* where the mechanical device is inserted." (Emphasis added). *See also State v. Guerrero-Flores*, 402 S.C. 530, 741 S.E.2d 577 (2013) (following *Rodriguez* and stating that "interception of a phone call can occur in two locations—the place where the tapped phone is located and the place where law enforcement officers first overhear the phone call").

The wiretap orders here were directed at cellphones to be used in Kansas. The target of TT1, the cellphone issued to "Heather Lock" was issued to the user residing at 1052 Longwood Avenue in Kansas City, Kansas. TT2 was directed to a cellphone issued to "David Lopez," at 1990 Orville Avenue in Kansas City, Kansas. TT6 was directed to a telephone issued to "Holly Nunez," residing at 113 Orville Avenue in Kansas City, Kansas. TT5 and TT7 authorized the tap of cellphones issued simply to "Prepaid Customer" with a listed address of 17330 Preston Road in Dallas, Texas, but the numbers (913-689-8694 and 913-553-0571) indicate the phones will be used in northeastern Kansas. All of the wiretap orders provided that the interception and recording of the conversations would occur at the DEA office in Johnson County. All of the interceptions in fact occurred at this DEA office.

17

That a similar result applies under Kansas law is confirmed by the opinion of the Kansas Supreme Court in *State v. Gibson*, 255 Kan. 474, 874. P.2d 1122 (1994), which reversed a decision by the Riley County District Court holding that it did not have authority under the state wiretap law to authorize a pen register, where the recording device was located in Riley County but the target or subject "slave" telephone unit was located in another county.[1]

In reaching this conclusion, the Supreme Court primarily held that the district court's factual assessment of the necessity of the out-of-county "slave" unit was in error. However, the Supreme Court also expressly agreed with the state's argument that, even if such a "slave" unit was necessary, the presence of the monitoring device in Riley County would support jurisdiction for such an order;

> The district court concluded that it had no power to authorize installation and use of a pen register unit when any part, not just any indispensable part, of it would be outside the judicial district. As discussed above, the State relies on wiretap cases which permit surveillance on telephones located outside the judicial district as long as the "interception" takes place within it. The rationale of those cases is built on the definitions of intercept, contents, and aural acquisition. Because a pen register does not involve eavesdropping on substantive voice communications, there is no

---

[1] Another Kanas case, *State v. Adams*, 2 Kan.App.2d 135, 576 P.2d 242, *rev. denied*, 225 Kan. 845 (1978) has no application here. In that case, the Court of Appeals suppressed evidence obtained from a Johnson County wiretap order. As the court stressed, "[t]he telephone, the interception bridge, and the monitoring station were all physically located in Wyandotte County." 2 Kan.App.2d at 135, 576 P.2d at 243. Ultimately, the court concluded: "Where there is interception of telephonic communications, and the locations of the telephone as to which the intercept is conducted, the intercepting device and the monitoring are within the same judicial district, a district judge sitting in another judicial district has no power … to authorize the interception." 2 Kan.App.2d at 139, 576 P.2d 245. Thus, *Adams* simply held that a district court cannot authorize a wiretap where *all* of the relevant devices or events existed outside the court's territory.

actual application of those definitions in the present circumstances. The State, however, urges the court to *analogize the interception of voice communications in the wiretap cases to the decoding of the electronic impulses into numbers dialed. In each instance, monitoring took place at law enforcement headquarters.* Hence, procurement of information in a form useful for investigative or evidentiary purposes occurred there. For this reason, even though the federal court in [*United States v.*] *Rodriguez,* [734 F.Supp. 116 (S.D.N.Y. 1990), *cert. denied,* 506 U.S. 847 (1992)] illustrated the logic of the interception analysis of the Georgia and Texas wiretap cases by contrasting the functions of wiretaps and pen registers, 734 F.Supp. at 121, *a similar analysis based on the monitoring location seems appropriate in the present pen register case.*

255 Kan. at 488, 874 P.2d at 1131 (emphasis added).

Because the monitoring location was located in Overland Park, Kansas, the state court had jurisdiction to issue the wiretap orders, and the defendants' jurisdictional argument is without merit.

### Good Faith

Finally, even if the defendants had otherwise demonstrated that the evidence obtained through the wiretaps was improper, the court finds that no exclusion should occur given the objective reasonableness of the investigating officers in relying on the warrant approved by the state court. *See United States v. Leon,* 468 U.S. 897, 913 (1984).

The investigating officers acted with the approval of state judicial officers, pursuant to procedures under which the targeted calls were initially intercepted, heard, and recorded in Johnson County, Kansas. The investigating agents attempted to have translators monitor the wiretaps "live," and were precluded from doing so by events outside their control. "After the fact" minimization occurred only after independent approval by the state court.

19

The defendants argue that there is no good faith basis for admission of the evidence, citing *United States v. Baker*, 894 F.2d 1144, 1148 (10th Cir. 1990). In fact, the court in *Baker* responded to the issue of the application of the good faith rule to a warrant void *ab initio* by stating that "we do not purport to resolve" the issue. Instead, the court simply held that the doctrine in any event would not apply under the facts of the case, given that case law "clearly established" that the Colorado state court judge had no authority to issue the warrant to search property on Indian land, and the equally clear admission by the investigating officer in the affidavit for warrant that "the actual criminal jurisdiction of this matter is unclear." *Id.*

No such indicia of a lack of good faith is present in this case. Here, as noted earlier, both *Rodriguez* and *Gibson* support the conclusion that the Johnson County state court had the jurisdiction to order interception of the calls in Johnson County. There is no evidence that any investigating agent actively doubted the validity of the procedure adopted, or otherwise sought to conceal information from the court. To the contrary, all of the evidence establishes that the investigating officers actively consulted with the court and the prosecutor's office in the ongoing execution of the warrant.

IT IS ACCORDINGLY ORDERED this 18th day of June, 2015, that the defendants'

Motions to Suppress (Dkt. 47, 69) are hereby denied.


 s/ J. Thomas Marten
J. Thomas Marten, Chief Judge